Robert P. CASEY; Allan S. Noonan; Ernest D. Preate, Jr., Petitioners,

v.

PLANNED PARENTHOOD OF SOUTH-EASTERN PENNSYLVANIA; Reproductive Health and Counseling Center; Women's Health Services, Inc.; Women's Suburban Clinic; Allentown Women's Center; and Thomas Allen, M.D., Respondents,

and

The Honorable Daniel H. Huyett, 3rd, Judge, United States District Court, Nominal Respondent.

PLANNED PARENTHOOD OF SOUTH-EASTERN PENNSYLVANIA; Reproductive Health and Counseling Center; Women's Health Services, Inc.; Women's Suburban Clinic; Allentown Women's Center; Thomas Allen, M.D., on behalf of himself and all others similarly situated

v.

Robert P. CASEY; N. Mark Richards; Ernest D. Preate, Jr., personally and in their official capacities; Michael D. Marino, personally and in his official capacity, together with all others similarly situated

Robert P. Casey, N. Mark Richards and Ernest D. Preate, Jr., Appellants.

Nos. 93–1503, 93–1504.

United States Court of Appeals, Third Circuit.

Argued Sept. 8, 1993.

Decided Jan. 14, 1994.

John G. Knorr, III (argued), Office of Atty. Gen. of Pennsylvania, Dept. of Justice, Harrisburg, PA, for petitioners/appellants.

Kathryn Kolbert (argued), New York City, Linda J. Wharton, Women's Law Project, Philadelphia, PA, for respondents/appellees.

Roger K. Evans, Planned Parenthood Federation of America, Inc., New York City, for respondent/appellee Planned Parenthood of Southeastern Pennsylvania.

Before: SCIRICA, COWEN and ROSENN, Circuit Judges.

## OPINION OF THE COURT

SCIRICA, Circuit Judge.

The Supreme Court, in deciding this case on appeal, laid down a specific mandate: "The judgment in No. 91–902 is affirmed. The judgment in No. 91–744 is affirmed in part and reversed in part, and the case is remanded for proceedings consistent with this opinion, including consideration of the question of severability." *Planned Parenthood of Southeastern Pa. v. Casey,* —— U.S. ——, ——, 112 S.Ct. 2791, 2833, 120 L.Ed.2d 674 (1992) (joint opinion of O'Connor, Kennedy, and Souter, JJ.) (*"Casey III"*).[1] We understood that opinion to resolve all questions in this case, except for severability. Instead, it has led to the present appeal of a district court order that not only reopens the case, but places in doubt the authority of the Supreme Court's decision. In its present guise, the case comes to us on a procedural matter, but one that calls into question the integrity of the three-tiered federal court system.

After the Supreme Court's decision, the abortion clinics challenging the Pennsylvania Abortion Control Act of 1982 as amended in 1988 and 1989, 18 Pa.Cons.Stat. §§ 3203–20 (1990) ("the Pennsylvania Act"),[2] moved to reopen the record in the district court and to continue the court's injunction against enforcement of the Pennsylvania Act, including those provisions the Supreme Court had declared· constitutional, pending further proceedings. *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 822 F.Supp. 227, 239 (E.D.Pa.1993) (*"Casey V"*). The clinics

contended they should be allowed to introduce evidence to meet the new "undue burden" standard under which the Supreme Court upheld most of the Pennsylvania Act. The district court granted the motions, believing it would be unfair to deny the clinics the opportunity to present evidence under the new standard and finding nothing in the Supreme Court's decision foreclosing further factual development. *Id.* at 235–36 (1993). The Commonwealth of Pennsylvania has appealed.

We must first decide whether we have jurisdiction over the Commonwealth's appeal. Assuming we have jurisdiction, we must then decide whether the Supreme Court's mandate in this case upholding contested provisions of the Pennsylvania Abortion Control Act permits another pre-implementation constitutional challenge to those same provisions in this case. While we acknowledge the careful effort the able trial judge brought to consideration of this question, we conclude the district court's action did not follow the mandates of the Supreme Court and of this court.

· In one critical respect, this case is like *Aaron v. Cooper,* 163 F.Supp. 13 (E.D.Ark.), *rev'd,* 257 F.2d 33 (8th Cir.), *aff'd, Cooper v. Aaron,* 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958), where a district court concluded that the mandate of a Supreme Court opinion, *Brown v. Board of Education,* 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955), did not require the law of the case to be applied immediately. The United States Court of Appeals for the Eighth Circuit concluded, as we have, that the district court had "most carefully and conscientiously considered the problem presented," *Aaron v. Cooper,* 257 F.2d 33, 38 (8th Cir.1958), but held, as we now hold, that the district court erroneously interpreted the Supreme Court's mandate.

---

**1.** In this opinion, we refer to five previous opinions in this case. To avoid confusion, we have numbered them in chronological order, *Casey I* through *Casey V.* They are: *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 744 F.Supp. 1323 (E.D.Pa.1990) (*"Casey I"*), *aff'd in part and rev'd in part,* 947 F.2d 682 (3d Cir.1991) (*"Casey II"*), *aff'd in part and rev'd in part,* —— U.S. ——, 112 S.Ct. 2791, 120 L.Ed.2d 674

(1992) (*"Casey III"*), *on remand,* 978 F.2d 74 (3d Cir.1992) (*"Casey IV"*), and *on remand,* 822 F.Supp. 227 (E.D.Pa.1993) (*"Casey V"*).

**2.** Relevant provisions of the Pennsylvania Act are reproduced in an appendix to the Supreme Court joint opinion. *Casey III,* —— U.S. at —— – ——, 112 S.Ct. at 2833–38.

## I.

This action concerns five provisions of the Pennsylvania Abortion Control Act of 1982. One provision, designed to ensure that a woman seeking an abortion has given her informed consent, requires the referring physician or the physician who will perform the abortion to speak with the patient at least 24 hours prior to the abortion, informing her of the nature and risks of abortion, the probable gestational age of the fetus, and the risks of carrying the child to term. One of those physicians, or a qualified medical practitioner, must also inform her of printed materials available from the Commonwealth concerning alternatives to abortion, medical assistance benefits for childbirth, and the liability of the father for support. 18 Pa.Cons.Stat. § 3205. The second provision requires a minor seeking an abortion to obtain the informed consent of one parent, but contains a judicial bypass option for a minor who cannot or does not want to obtain a parent's consent. *Id.* § 3206. The third provision requires a married woman seeking an abortion to notify her husband in advance of the abortion. *Id.* § 3209. The fourth exempts a woman from each of these three requirements in the event of a "medical emergency," defined as a situation in which the physician believes an immediate abortion is necessary to avoid death or believes a delay "will create serious risk of substantial and irreversible impairment of major bodily function." *Id.* § 3203. The fifth provision imposes recordkeeping and reporting requirements on physicians and abortion clinics. *Id.* §§ 3207(b) & 3214(a).

In 1988, five abortion clinics and one physician challenged these statutory provisions as violating the right of privacy embodied in the Due Process Clause. After a bench trial, the district court struck down each provision for failing to meet the strict scrutiny test estab-

lished by *Roe v. Wade,* 410 U.S. 113, 155, 93 S.Ct. 705, 728, 35 L.Ed.2d 147 (1973), under which a law regulating abortion must be "narrowly drawn" to serve a "compelling state interest." *Planned Parenthood. of Southeastern Pennsylvania v. Casey,* 744 F.Supp. 1323, 1372–95 (E.D.Pa.1990) ("*Casey I*").

We reversed on appeal. *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 947 F.2d 682 (3d Cir.1991) ("*Casey II*"). Our decision turned largely on our use of a different standard of review. Applying the rules governing plurality opinions of the Supreme Court set forth in *Marks v. United States,* 430 U.S. 188, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977),[3] we concluded that intervening Supreme Court decisions had narrowed *Roe* so that strict scrutiny review applied only to those laws which imposed an "undue burden" on the woman seeking an abortion. *Casey II,* 947 F.2d at 697. We adopted the definition of "undue burden" set forth in Justice O'Connor's dissenting opinion in *Akron v. Akron Center for Reproductive Health, Inc.,* 462 U.S. 416, 103 S.Ct. 2481, 76 L.Ed.2d 687 (1983)—an "absolute obstacle[ ] or severe limitation[ ] on the abortion decision." *Id.* at 464, 103 S.Ct. at 2510 (O'Connor, J., dissenting). We held that only the spousal notification provision imposed such a burden and upheld the remaining provisions of the Pennsylvania Act.

The Supreme Court affirmed in part and reversed in part. *Casey III,* —— U.S. at ——, 112 S.Ct. at 2833 (1992). In considering the constitutionality of the Pennsylvania Act; the Court modified the "undue burden" standard that we had applied in two respects.[4] It defined an "undue burden" more broadly than we had done, as a provision whose "purpose or effect is to place a substantial obstacle in the path of a woman

---

3. The Court in *Marks* stated:

 When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, "the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds...."

 *Marks,* 430 U.S. at 193, 97 S.Ct. at 993 (1977) (quoting *Gregg v. Georgia,* 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 2923 n. 15, 49 L.Ed.2d 859

(1976)) (opinion of Stewart, Powell, and Stevens, JJ.).

4. The joint opinion of Justices O'Connor, Kennedy and Souter provides the narrowest grounds for the judgments in which various other justices concurred to form majorities on different issues. Under the rule of *Marks, supra* note 3, the joint opinion is therefore cited for the holdings of the Court.

seeking an abortion before the fetus attains viability." *Id.* at ——, 112 S.Ct. at 2821. In addition, the Court established the "undue burden" test as the sole standard for assessing the constitutionality of an abortion regulation, rather than as a threshold inquiry for triggering strict scrutiny review, as we had held. *Id.* at ——, 112 S.Ct. at 2817, 2820–21. The Court then applied its new test to uphold all but the spousal notification provision and its corresponding recordkeeping provision, *id.* at —— – ——, 112 S.Ct. at 2821–33, and "remanded for proceedings consistent with this opinion, including consideration of the question of severability." *Id.* at ——, 112 S.Ct. at 2833.

On remand, we concluded the unconstitutional spousal notification provision and the corresponding recordkeeping provision were severable from the remainder of the Pennsylvania Act and we amended our judgment to reflect the Supreme Court's reversal of our judgment on the recordkeeping provision. We "remanded for such further proceedings as may be appropriate." *Planned Parenthood of Southeastern Pennsylvania v. Casey,* 978 F.2d 74, 78 (1992) ("*Casey* IV"*).*

The clinics subsequently moved in the district court to reopen the record and to continue the injunction pending further development. In granting the motion, the district court held it had discretion under our remand order and that of the Supreme Court to reopen the record and receive further evidence, and chose to exercise that discretion. The court explained that fairness supported reopening the record because the Supreme Court's new "undue burden" standard meant that the clinics "have essentially had the rules of the game changed while in the midst of play." *Casey* V, 822 F.Supp. at 236. It also found that not reopening the record would subject women seeking abortions to undue prejudice and irreparably harm those women deterred from seeking abortions while the law was in place. *Id.* The court reasoned that judicial economy would be served by hearing the inevitable further constitutional challenge to the Pennsylvania Act

in this lawsuit rather than in a separate subsequent action. *Id.* Therefore, the court continued the injunction and set a date for a new trial.

The Commonwealth appeals this decision under the interlocutory appeal provision, 28 U.S.C. § 1292(a)(1) (1993) and, in the alternative, seeks a writ of mandamus on the ground that the district court violated our mandate in reopening the record.

## II.

▓▓▓ The clinics contend we lack appellate jurisdiction, arguing that the district court's continuation of the injunction and its decision to reopen the record are not subject to interlocutory appeal. Title 28 U.S.C. § 1292(a)(1) authorizes appellate jurisdiction over "[i]nterlocutory orders of the district courts ... granting, continuing, modifying, refusing or dissolving injunctions, or refusing to dissolve or modify injunctions, ..." We have defined an "injunction" for purposes of § 1292(a)(1) as an order "directed to a party, enforceable by contempt, and designed to accord or protect 'some or all of the substantive relief sought by a complaint' in more than a [temporary] fashion."[5] *Cohen v. Board of Trustees,* 867 F.2d 1455, 1465 n. 9 (3d Cir.1989) (in banc) (quoting Charles A. Wright et al., 12 *Federal Practice and Procedure* § 3922 (1977)). Conversely, pretrial orders such as orders to compel discovery and denials of summary judgment are not "injunctions" because they do not "grant part of ·the relief requested by the claimant." *Hershey Foods Corp. v. Hershey Creamery Co.,* 945 F.2d 1272, 1277 (3d Cir.1991).

The clinics contend we lack jurisdiction over the district court's order under *Carson v. American Brands, Inc.,* 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981). There, the Supreme Court held that an interlocutory order having "the practical effect of refusing an injunction" is appealable only upon a showing that the order "might have a 'serious, perhaps irreparable, consequence,' and that the order can be 'effectually challenged' only by immediate appeal." *Id.* at 84, 101

---

**5.** The word "temporary" appears in brackets in *Cohen* because it was substituted for the word "preliminary," which occurred in the passage quoted from Charles A. Wright et al., 12 *Federal Practice and Procedure* § 3922 (1977).

S.Ct. at 996 (citation omitted in original). The Commonwealth maintains the *Carson* requirements do not apply because the district court continued the grant of injunctive relief and *Carson* applies only to interlocutory orders that have the practical effect of denying injunctive relief.

■ Both case law and sound policy support the Commonwealth's position. In agreeing to hear an appeal from an injunction in *Cohen*, we expressly rejected appellee's contention that the *Carson* requirements applied. We reasoned that *Carson* imposed the additional requirements because the order appealed from in that case had denied injunctive relief.[6] We reaffirmed the distinction between grants and denials of injunctive relief in *Ross v. Zavarella*, 916 F.2d 898 (3d Cir.1990). There, we dismissed an appeal from a grant of a motion to dismiss, reasoning that because the ruling had the indirect effect of denying plaintiff's motion for a preliminary injunction, *Cohen* was distinguishable and the *Carson* requirements applied.[7] *Id.* at 902. Furthermore, it is sound policy to distinguish between grants and denials of injunctions for purposes of interlocutory appeal. Unlike a denial, a grant of injunctive relief subjects the losing party to contempt, and provides some or all of the relief sought by the claimant, two of the key features we identified in *Cohen* as justifying an interlocutory appeal. *Cohen*, 867 F.2d at 1465 n. 9.[8]

■ The clinics also contend the district court's order continuing the injunction is not appealable because its short duration makes it more like a pretrial ruling than a substantive ruling granting relief. While it is true

that certain pre-trial rulings, like discovery orders or denials of class certification, do not merit interlocutory appeal because they "in no way touch on the merits of the claim but only relate to pretrial procedures," *Switzerland Cheese Ass'n v. E. Horne's Market, Inc.,* 385 U.S. 23, 25, 87 S.Ct. 193, 195, 17 L.Ed.2d 23 (1966), we do not believe the district court's order here is of that character. The order itself continues an injunction against enforcement of the contested provisions, which is the ultimate relief the clinics seek on the merits of their challenge. Therefore, we have appellate jurisdiction because this is an appeal from a continuance of an injunction.

■ Nor does the 100–day duration of the order render it non-appealable as an order granting relief in a "temporary" fashion within the meaning of *Cohen*, 867 F.2d at 1465 n. 9. We believe *Cohen's* adoption of the word "temporary" refers to a temporary restraining order, which may not extend beyond twenty days, Fed.R.Civ.P. 65(b), and which is not ordinarily appealable "unless its denial decides the merits of the case or is equivalent to a dismissal of the claim." *Robinson v. Lehman*, 771 F.2d 772, 782 (3d Cir.1985). The order here is of significantly longer duration than a temporary restraining order, since it would last at least the 100 days until the new trial is held, and probably longer, in the event of further post-trial proceedings or additional time for the district court to rule.

■ We also find the order granting a new trial is appealable. We have held that when an order is "inextricably bound" to an ap-

---

6. In *Carson*, injunctive relief was tacitly denied in an order designated as something else, and it therefore fell outside the express terms of § 1292(a)(1). *Carson* had provided the appellant with a way to appeal the order in the unusual circumstances of that case; as we said, *Carson* "is a door opening, not a door closing decision." *Cohen*, 867 F.2d at 1467.

7. We also noted that in *Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 379, 107 S.Ct. 1177, 1183–84, 94 L.Ed.2d 389 (1987), the Court made clear that *Carson* applied to all denials of injunctive relief, not just indirect denials such as the order in *Carson*. *Ross*, 916 F.2d at 902.

8. For these reasons, we are not persuaded by the clinics' contention that we abandoned the distinction between grants and denials of injunctive relief in *Vuitton v. White*, 945 F.2d 569 (3d Cir. 1991) by stating, "Under this court's recent decision in *Ross v. Zavarella*, even orders concerning injunctions, that are clearly covered by § 1292(a)(1), must meet the requirements set forth in *Carson*." *Id.* at 574 (citations omitted). Both the facts of *Vuitton*, which involved an appeal from a denial of an ex parte seizure order, and its citation to *Ross*, a case involving a denial that relied on the distinction between grants and denials of injunctions, reveal that our use of the word "concerning" there referred to a denial.

pealable injunction such that the injunction issue "cannot be resolved without reference to the otherwise nonappealable issue," we must address both issues on appeal. *Kershner v. Mazurkiewicz*, 670 F.2d 440, 449 (3d Cir.1982) (in banc) (emphasis omitted). Here, the district court continued the injunction merely to preserve the status quo until it could resolve the underlying constitutional issues at a new trial. The propriety of the injunction depends upon the propriety of the grant of a new trial. The order granting a new trial is therefore "inextricably bound" to the appealable injunction and we must address both issues on appeal. For these reasons, we have appellate jurisdiction over the district court's orders to continue the injunction and to reopen the record in a new trial, and we address the merits of the Commonwealth's appeal.[9]

### III.

The merits of this appeal turn on whether reopening the trial to allow the clinics to submit additional proof conflicts with the Supreme Court's mandate or our mandate on remand.[10]

#### A. *The Law of the Case and the Mandate Rule*

 Law of the case rules have developed "to maintain consistency and avoid reconsideration of matters once decided during the course of a single continuing lawsuit." Charles A. Wright et al., 18 *Federal Rules and Practice* § 4478 (1981). Of these rules, the most compelling is the mandate rule.[11] This fundamental rule binds every court to honor rulings in the case by superior courts.

As the Supreme Court has stated, "In its earliest days this Court consistently held that an inferior court has no power or authority to deviate from the mandate issued by an appellate court." *Briggs v. Pennsylvania R. Co.*, 334 U.S. 304, 306, 68 S.Ct. 1039, 1040, 92 L.Ed. 1403 (1948). The statutory authority for the power of the appellate courts dates from the first Judiciary Act of 1789 and is now found in 28 U.S.C. § 2106.[12]

An early statement of the rule and the respective roles of the different levels of the federal courts appears in *Sibbald v. United States*, 37 U.S. (12 Pet.) 488, 9 L.Ed. 1167 (1838):

> When the supreme court have executed their power, in a cause before them, and their final decree or judgment requires some further act to be done, it cannot issue an execution, but shall send a special mandate to the court below to award it. 24th sect. Judiciary Act, 1 U.S. Stat. 85. Whatever was before the court, and is disposed of, is considered as finally settled. The inferior court is bound by the decree as the law of the case; and must carry it into execution, according to the mandate. They cannot vary it, nor examine it for any other purpose than execution; nor give any other or further relief; nor review it upon any matter decided on appeal, for error apparent; nor intermeddle with it, further than to settle so much as has been remanded.

*Id.* at 491 (citations omitted).

More than half a century later, the Supreme Court restated this rule, and expanded it:

---

**9.** In light of our disposition, we do not consider whether mandamus would be appropriate. *Bailey v. Systems Innovation, Inc.*, 852 F.2d 93, 96 (3d Cir.1988) (citing *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21, 26, 63 S.Ct. 938, 941–42, 87 L.Ed. 1185 (1943) (mandamus should not be used as a substitute means to review a properly appealable order)).

**10.** Because the Supreme Court's definition of "undue burden" in applying the new standard was different from that of the original panel of this court, which applied a different undue burden standard, the mandate of the original panel in *Casey* II is not at issue here.

**11.** Other law of the case rules apply to subsequent rulings by the same judge in the same case or a closely related one, to rulings by different judges at the same level, or to the consequences of the failure to preserve an issue for appeal. *See* Charles A. Wright et al., 18 *Federal Rules and Procedure* § 4478 (1981).

**12.** This section provides:

> The Supreme Court or any other court of appellate jurisdiction may affirm, modify, vacate, set aside or reverse any judgment, decree, or order of a court lawfully brought before it for review, and may remand the cause and direct the entry of such appropriate judgment, decree, or order, or require such further proceedings to be had as may be just under the circumstances.

28 U.S.C. § 2106.

If the Circuit Court mistakes or miscon-
strues the decree of this court, and does
not give full effect to the mandate, its
action may be controlled, either upon a
new appeal ... or by a writ of mandamus
to execute the mandate of this court....
But the Circuit Court may consider and
decide any matters left open by the man-
date of this court; and its decision of such
matters can be reviewed by a new appeal
only.... The opinion delivered by this
court, at the time of rendering its decree,
may be consulted to ascertain what was
intended by its mandate; ...

*In re Sanford Fork & Tool Co.,* 160 U.S. 247,
255–56, 16 S.Ct. 291, 293, 40 L.Ed. 414 (1895)
(citations omitted).

A recent statement of the rule by this
court shows that the rule has remained es-
sentially unchanged in nearly one hundred
fifty years:

It is axiomatic that on remand for fur-
ther proceedings after decision by an ap-
pellate court, the trial court must proceed
in accordance with the mandate and the
law of the case as established on appeal.

A trial court must implement both the
letter and spirit of the mandate, taking
into account the appellate court's opinion
and the circumstances it embraces.

*Bankers Trust Co. v. Bethlehem Steel Corp.,*
761 F.2d 943, 949 (3d Cir.1985) (citations
omitted). The rule ensures "careful observa-
tion of [the] allocation of authority" estab-
lished by the three-tier system of federal
courts which "is necessary for a properly
functioning judiciary." *Litman v. Massa-
chusetts Mut. Life Ins. Co.,* 825 F.2d 1506,
1508 (11th Cir.1987).

■ The mandate rule applies, however,
only to those issues that were decided by the
appellate court. *Sanford Fork & Tool,* 160
U.S. at 256, 16 S.Ct. at 293. On remand, a
trial court is free to "make any order or
direction in further progress of the case, not
inconsistent with the decision of the appellate
court, as to any question not settled by the
decision." *Bankers Trust Co.,* 761 F.2d at
950. "[I]t may consider, as a matter of first
impression, those issues not expressly or im-
plicitly disposed of by the appellate decision."
*Id.*

The district court has entered an order for
a new trial to allow the clinics to submit
additional proof challenging the constitution-
ality of provisions of the Pennsylvania Abor-
tion Control Act under the new standard set
out by the Supreme Court in this case. As
we have noted, the question before us is
whether this order is consistent with the
Supreme Court's mandate and with our man-
date on remand or whether it impermissibly
reopens issues already decided by the Court.

### B. *The Supreme Court's Mandate*

■ When the Supreme Court adopts a
new legal standard, it sometimes explicitly
remands the case for the courts below to
apply the new standard in the first instance.
*See, e.g., Lucas v. South Carolina Coastal
Council,* —— U.S. ——, 112 S.Ct. 2886, 120
L.Ed.2d 798 (1992); *Rufo v. Inmates of Suf-
folk County Jail,* —— U.S. ——, 112 S.Ct.
748, 116 L.Ed.2d 867 (1992); *id.* at ——, 112
S.Ct. at 768 (Stevens, J., dissenting) (Court
should have affirmed rather than vacating
and remanding). On other occasions, it ap-
plies the new standard itself and decides the
merits. *See, e.g., Farrar v. Hobby,* —— U.S.
——, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992);
*id.* at ——, 113 S.Ct. at 579–80 (White, J.,
dissenting) (Court should have remanded for
application of correct standard); *McCleskey
v. Zant,* 499 U.S. 467, 111 S.Ct. 1454, 113
L.Ed.2d 517 (1991); *id.* at ——, 111 S.Ct. at
1486–87 (Marshall, J., dissenting) (same).

■ We must look to the language of the
Supreme Court's opinion to see what it in-
tended in this case. After formulating a new
standard to be applied to the Pennsylvania
Act, the Court said, "[W]e now turn to the
issue of the validity of its challenged provi-
sions." *Casey III,* —— U.S. at ——, 112
S.Ct. at 2821. It then ruled on the constitu-
tionality of one section after another, and
found constitutional all provisions except
those relating to spousal notice. *Id.* at
—— ——, 112 S.Ct. at 2821–33. The lan-
guage of the Supreme Court's opinion makes
clear that the Court applied the new stan-
dard and decided the merits.

We have examined the Supreme Court's resolution of the contested sections of the Pennsylvania Act to determine whether introduction of new evidence would be consistent with the Court's opinion. The district court did not conduct this analysis, simply holding that the Court had not considered the precise issue of whether new evidence could establish that the provisions impose an undue burden. The contested provisions are: (1) the informed consent provision, requiring the woman's physician to give her certain information and imposing a 24–hour waiting period between provision of the information and the abortion, 18 Pa.Cons.Stat.Ann. § 3205; (2) the parental notification provision for minors, *id.* § 3206; and (3) the reporting and recordkeeping provision for doctors and clinics, *id.* § 3214.[13]

Upholding the parental consent provision as requiring an unemancipated minor woman to obtain the informed consent of one of her parents or of a state Common Pleas judge before obtaining an abortion, the Court stated:

> We have been over most of this ground before. Our cases establish, and we reaffirm today, that a State may require a minor seeking an abortion to obtain the consent of a parent or guardian, provided that there is an adequate judicial bypass procedure. *See, e.g., Akron II [Ohio v. Akron Center for Reproductive Health,* 497 U.S. 502, 110 S.Ct. 2972, 111 L.Ed.2d 405 (1990) ], *Hodgson [v. Minnesota,* 497 U.S. 417, 110 S.Ct. 2926, 111 L.Ed.2d 344 (1990) ], *Akron I, Bellotti II [Bellotti v. Baird,* 428 U.S. 132, 96 S.Ct. 2857, 49 L.Ed.2d 844 ·(1976) ].* Under these precedents, in our view, the one-parent consent requirement and judicial bypass procedure are constitutional.

*Casey* III, —— U.S. at ——, 112 S.Ct. at 2832 (partial citations omitted).

The Court rejected the clinics' effort to distinguish parental consent provisions it had upheld in prior opinions on the ground that the Pennsylvania provision requires "in-

formed consent." The Court stated the informed consent provision only strengthened the constitutionality of the Pennsylvania Act, because a waiting period might give a parent the opportunity to consult with the minor in private and discuss "the consequences of her decision in the context of the values and moral or religious principles of their family." *Casey* III, —— U.S. at ——, 112 S.Ct. at 2832. The Court's summary treatment of the provision, as well as its use of the words "under these precedents" make clear that reopening the trial for new evidence on this issue would be inconsistent with the Supreme Court's mandate.

The Court's disposition of the remaining two provisions—the informed consent provision, which includes both a 24–hour waiting period and required physician counseling, and the recordkeeping and reporting provision—is also unambiguous, but more limited. On the requirement that a doctor rather than a "qualified assistant" provide the counseling information, the Court stated, "Since there is no evidence on this record that requiring a doctor to give the information as provided by the statute would amount in practical terms to a substantial obstacle to a woman seeking an abortion, we conclude that it is not an undue burden." *Casey* III, —— U.S. at ——, 112 S.Ct. at 2824. Its analysis of the 24–hour waiting period is more limited still. The Court noted the question was "closer," and stated it "d[id] not doubt that, as the District Court held, the waiting period has the effect of 'increasing the costs and risk of delay of abortions.'" *Id.* at ——, 112 S.Ct. at 2825 (quoting district court opinion). But, the Court continued, because the district court had applied *Roe*'s trimester framework rather than the "undue burden" standard, that court did not consider whether these costs and delays "amount to substantial obstacles" necessary to create an undue burden. *Id.* at ——, 112 S.Ct. at 2825. It went on to say, "[O]n the record before us, and in the context of this facial challenge, we are

---

**13.** Because the Court affirmed our earlier decision striking down the spousal notification provision, § 3209, and the corresponding recordkeeping provision, § 3214(a)(12), as "undue burdens," and the Commonwealth does not contest these rulings, those provisions are no longer at

issue. Additionally, the clinics have abandoned their attack on the provision exempting women from the statute's informed consent, spousal notification, and parental notification provisions in the event of a "medical emergency," § 3203.

not convinced that the 24–hour waiting period constitutes an undue burden." *Id.* at ——, 112 S.Ct. at 2826.

On the reporting and recordkeeping provisions, the Court stated it had previously held such provisions " 'that are reasonably directed to the preservation of maternal health and that properly respect a patient's confidentiality and privacy are permissible.' " *Casey III,* —— U.S. at ——, 112 S.Ct. at 2832 (quoting *Planned Parenthood of Central Mo. v. Danforth,* 428 U.S. 52, 80, 96 S.Ct. 2831, 2846, 49 L.Ed.2d 788 (1976)). It then held that "under this standard, all the provisions at issue here except that relating to spousal notice are constitutional." *Id.* It concluded that the other provisions did "relate to" maternal health because "[t]he collection of information with respect to actual patients is a vital element of medical research." *Id.* at ——, 112 S.Ct. at 2832–33. "Nor," the Court continued, "do we find that the requirements impose a substantial obstacle to a woman's choice. At most they might increase the cost of some abortions by a slight amount. While at some point increased cost could become a substantial obstacle, there is no such showing on the record before us." *Id.* at ——, 112 S.Ct. at 2833.

### C. *The District Court's Opinion and the Arguments on Appeal*

■ In reopening the case, the district court reasoned that neither this court nor the Supreme Court could have considered the "precise issue" the clinics now wish to raise—whether their new evidence will establish that the challenged provisions of the Pennsylvania Act "have the purpose or effect of placing a substantial obstacle in the path of a woman seeking an abortion." *Casey V,* 822 F.Supp. at 233. In other words, the Supreme Court did not decide whether new evidence would meet the new standard it set out in the case.

It is true that the Supreme Court ruled on the record as it then existed. An appellate court always decides a case on the record before it; it cannot do otherwise. In that sense, the "precise issue" that the district court believed remained open in this case is always left open after appellate review. Even when the appellate court does not announce a new standard, its refinements and clarifications of law and applications of established law to new circumstances may shift the rules in ways that disadvantage some litigants in the cases before it. But the clinics' approach could render non-final virtually every appellate decision beyond a simple affirmance based on the record and every appellate decision in which the court applied a new standard or altered an old one. Such an approach would undermine the finality of appellate court decisions and dramatically alter relations among the different levels of the judiciary.

■ The clinics contend, and the district court found, that there was nothing in the mandate of the. Supreme Court or of this court on remand expressly or impliedly precluding the district court's order of a new trial. As we have noted, the Supreme Court affirmed in part, reversed in part, and remanded "for proceedings consistent with this opinion, including the question of severability." *Casey III,* —— U.S. at ——, 112 S.Ct. at 2833. On remand from the Supreme Court, our panel decided the severability issue and remanded "for such further proceedings as may be appropriate." *Casey IV,* 978 F.2d at 78. As we have held before, where the appellate court "directs the [lower] court to act in accordance with the appellate opinion, . . . the opinion becomes part of the mandate and must be considered together with it." *Delgrosso v. Spang & Co.,* 903 F.2d 234, 240 (3d Cir.), *cert. denied,* 498 U.S. 967, 111 S.Ct. 428, 112 L.Ed.2d 412 (1990) (citations omitted). On remand, both we and the district court were bound to follow the mandate of the Supreme Court as embodied in its opinion. Thus, the language of the Supreme Court opinion is the only authoritative source here.

■ The Commonwealth argues that the Supreme Court's decision to affirm in part and reverse in part rather than to vacate our decision demonstrates that it did not contemplate further substantive proceedings in the district court. *Casey III,* —— U.S. at ——, 112 S.Ct. at 2833. Appellate courts, however, sometimes reverse even when they make clear in the body of the opinion that they intend the district court to reopen the record

on remand. *See e.g. Lucas,* —— U.S. at ——, 112 S.Ct. at 2901–02. Therefore, its directions to reverse in part are not dispositive.

■ What is significant is that the Supreme Court singled out only one issue to be considered on remand—severability. This directive, taken together with the language of the body of the opinion, can only mean that the Court did not intend the lower courts to consider additional issues or to undertake proceedings other than routine, ministerial ones necessary to carrying out its mandate, such as vacating the injunction and entering judgment. We believe the Supreme Court meant what it said when it remanded "for proceedings consistent with this opinion," and then expressly instructed consideration on remand of one issue it had not decided. Under 28 U.S.C. § 2106, the Supreme Court can "require such further proceedings to be had as may be just under the circumstances." The Court did so when it directed us to consider the question of severability, and no other question.

14. The record before the Supreme Court included the following findings of fact by the district court with regard to the requirement that physicians disclose information to patients:

In many instances, trained counsellors, who are women, are more understanding than physicians and have more time to spend with patients. Further, it is more economical for the plaintiff-clinics to utilize trained counselors to provide options counseling and informed consent information to patients seeking an abortion. If the physician-only disclosure requirements become law, the added costs incurred by abortion providers will be imposed upon the women seeking abortions....
The requirement ... that physicians personally provide information necessary for informed consent will require extensive changes in the operating schedules of plaintiff-clinics and plaintiff-physicians. Physicians' schedules will need to be expanded to include additional medical consultation and counseling sessions which would be required by the Act or additional physicians will have to be hired to provide these additional services. It will be difficult to find available physicians to provide these additional services, because of the doctors' already busy schedules....
*Casey I,* 744 F.Supp. at 1353 (footnote, citations, and paragraph numbers omitted).

15. The record before the Supreme Court included the following findings of fact by the district court with regard to the 24–hour waiting period:

■ Arguing that reopening the case was proper, the clinics emphasize the Court's periodic use of the words "on this record" in upholding certain provisions of the law, as well as statements in the concurrences of both Justices Blackmun and Scalia. In the clinics' view, use of these words reveals that the Supreme Court did not bar reopening the record.

The Court used the term "on this record" once and "on the record before us" twice in the joint opinion. In discussing the informed consent provision of the Pennsylvania Act, the Court said, "Since there is no evidence on this record that requiring a doctor to give the information as provided by the statute would amount in practical terms to a substantial obstacle to a woman seeking an abortion, we conclude that it is not an undue burden." [14] *Casey III,* —— U.S. at ——, 112 S.Ct. at 2824. "[O]n the record before us, and in the context of this facial challenge, we are not convinced that the 24–hour waiting period constitutes an undue burden." [15] *Id.* at

[It] ... will force every women [sic] seeking an abortion in Pennsylvania to make a minimum of two visits to an abortion provider....

. . . . .

Because most of plaintiff-clinics and plaintiff-physicians do not perform abortions on a daily basis, the mandatory 24–hour waiting period will result in delays far in excess of 24 hours. For the majority of women in Pennsylvania, delays will range from 48 hours to two weeks....

. . . . .

[It] ... would force women to double their travel time or stay overnight at a location near the abortion facility. This will necessarily add ... to the overall cost of her abortion. Additionally, many women may lose additional wages or other compensation as a result of the mandatory 24–hour delay, if forced to miss work on two separate occasions.

. . . . .

The ... waiting period will be particularly burdensome to those women who have the least financial resources, such as the poor and the young, those women that travel long distances, such as women living in rural areas, and those women that have difficulty explaining their whereabouts, such as battered women, school age women, and working women without sick leave.
In some cases, the delays caused by the 24–hour waiting period will push patients into the second trimester of their pregnancy substantially increasing the cost of the procedure itself

——, 112 S.Ct. at 2826. In analyzing the recordkeeping and reporting requirements of the statute, the Court stated that "[w]hile at some point increased cost could become a substantial obstacle, there is no such showing on the record before us."[16] *Id.* at ——, 112 S.Ct. at 2833. Yet, the joint opinion did not hesitate to apply the new standard, even on the limited record.[17]

By basing its rulings on informed consent and recordkeeping "on the record," the Court signalled that it was not announcing a *per se* rule. At a minimum, we believe the Court meant that other state abortion laws require individualized application of the undue burden standard. Our view is bolstered by Justice O'Connor's concurring opinion denying a stay in *Fargo Women's Health Organization v. Schafer,* —— U.S. ——, ——, 113 S.Ct. 1668, 1669, 123 L.Ed.2d 285 (1993), which noted: "the joint opinion [in *Casey* III] specifically examined the record developed in the district court in determining that Pennsylvania's informed consent provision did not create an undue burden.... [T]he lower courts [in *Fargo* ] should have undertaken the same analysis."

In addition, by limiting its holdings to the record, we believe the Court meant that a future "as applied" challenge to the Pennsylvania Act would be possible, and plaintiffs could demonstrate in practice that the Act

and making the procedure more dangerous medically.

A delay of 24 hours will have a negative impact on both the physical and psychological health of some patients, as well as increase the risk of complications.

*Casey* I, 744 F.Supp. at 1351–52 (citations and paragraph numbers omitted).

**16.** The district court made no findings of fact on the cost of recordkeeping, although it made many findings on the burden the public disclosure of records might impose on clinics and physicians. In particular, it found the public disclosure might affect the ease and availability of abortions. Witnesses testified that some physicians were so averse to any possibility of publicity resulting from referring patients for abortion that they would cease to do so if the records were to be made publicly available. The district court stated: "The evidence of record persuades me that the expectation of plaintiff-clinics that referring physicians and, to a lesser extent, performing physicians will terminate their relationship with the clinics is reasonable." *Casey* I, 744 F.Supp. at 1371. The Supreme Court did not discuss this aspect of recordkeeping and reporting, but did not find the provisions unduly burdensome.

Although [the recordkeeping and reporting provisions] do not relate to the State's interest in informing the woman's choice, they do relate to health. The collection of information with respect to actual patients is a vital element of medical research, and so it cannot be said that the requirements serve no purpose other than to make abortions more difficult. Nor do we find that the requirements impose a substantial obstacle to a woman's choice. At most they might increase the cost of some abortions by a slight amount. While at some

point increased cost could become a substantial obstacle, there is no such showing on the record before us.

*Casey* III, —— U.S. at ——, 112 S.Ct. at 2832–33.

**17.** Other opinions in the case also read the mandate as limited to the record before the Court. Justice Blackmun believed that the joint opinion erred in failing to invalidate the other challenged sections of the act as well. He stated:

I am pleased that the joint opinion has not ruled out the possibility that these regulations may be shown to impose an unconstitutional burden. The joint opinion makes clear that its specific holdings are based on the insufficiency of the record before it. I am confident that in the future evidence will be produced to show that "in a large fraction of the cases in which [these regulations are] relevant, [they] will operate as a substantial obstacle to a woman's choice to undergo an abortion."

*Casey* III, —— U.S. at ——, 112 S.Ct. at 2845 (Blackmun, J., concurring and dissenting) (citations omitted) (alterations in original).

Justice Scalia, in criticizing the joint opinion's failure to clarify its undue burden standard, stated:

We do not know whether the same conclusions could have been reached on a different record, or in what respects the record would have had to differ before an opposite conclusion would have been appropriate.

. . . . .

[T]he "undue burden" standard may ultimately require the invalidation of each provision upheld today if it can be shown, on a better record, that the State is too effectively "express[ing]" a preference for childbirth over abortion." Reason finds no refuge in this jurisprudence of confusion.

*Id.* at ——, 112 S.Ct. at 2880 (Scalia, J., concurring in part and dissenting in part) (quoting joint opinion at ——, 112 S.Ct. at 2824) (citation omitted).

imposed an undue burden.[18] Any future challenge must, however, await implementation of the Act. The Court's thorough disposition of the clinics' legal and factual arguments challenging each contested provision and its careful, provision-specific application of the "undue burden" test cannot have been a dry run for a second trial in which the district court would go through the same exercise, at least prior to implementation of the law.

### D. *Exceptions to Law of the Case Rules*

■ The clinics contend this case falls under one or more of the well recognized exceptions to the "law of the case" doctrine, especially that of an intervening change in controlling law. This exception has been applied when the intervening change takes place in a different case. *See, e.g., Zichy v. Philadelphia*, 590 F.2d 503 (3d Cir.1979) (reconsidering our earlier dismissal of a Title VII claim in light of intervening Supreme Court decision in *Nashville Gas Co. v. Satty*, 434 U.S. 136, 98 S.Ct. 347, 54 L.Ed.2d 356 (1977)). The clinics have cited no case, and we have found none, in which a change of controlling law made and applied by an appellate court was treated as an intervening change of law to justify the trial court's reopening the record absent directions from the appellate court to do so. Thus, this exception is necessarily cabined by the mandate rule. If there is an intervening change in law here, it is not only that a new "undue burden" standard governs the constitutionality of state abortion regulations but also that the Pennsylvania Act survives a pre-implementation facial challenge under this standard. To hold otherwise would undermine the law of the case rule in any appellate decision announcing a new rule and applying it in the case before it. The district court must "proceed in accordance with ... the law of the case as established on appeal." *Bankers Trust*, 761 F.2d at 949.

■ Nor can we accept the clinics' contention that we should decline to accord law of the case status to the Court's holding on the Pennsylvania Act because to do so would cause "manifest injustice" or disserve "judicial economy." Like an intervening change in the law, these exceptions to the law of the case doctrine may not be applied in a way that conflicts with the mandate of the Supreme Court. The circumstances giving rise to these arguments, like those relating to the intervening change in law, did not appear for the first time on remand. There is nothing here of which the Supreme Court was not aware when it decided the case. The Court chose to apply the new standard rather than to vacate and remand for its application below. It took this course despite the fact that litigants had argued under another rule, despite the limitations of the record, and despite the fact that there might be a future constitutional challenge to the Pennsylvania Act. The Court's mandate directed us to carry out its judgment.[19]

### E. *The Mandate on Remand*

■ The clinics also argue our remand opinion implicitly authorized a second pre-implementation facial challenge. On remand, we concluded that the spousal notification provision and the corresponding recordkeeping provisions, which the Supreme Court had held were unconstitutional, were severable from the remainder of the law. We amended our judgment to reflect this change and we "remanded for such further proceedings as may be appropriate." *Casey IV*, 978 F.2d at 78. Parenthetically, we noted:

> [T]he Clinics assert, as an aside, that they will request the district court to open the record and make further factual findings related to both the "new undue burden analysis" adopted by the Supreme Court, as well as the "preparedness of the Commonwealth to implement the Act." The

---

18. Even absent the Court's language limiting its holdings to the record before it, an "as applied" challenge is always possible after implementation.

19. The clinics cite certain cases purportedly supporting their position on exceptions to the law of the case rule, but none is apposite to this case where the Court laid down the mandate with full knowledge of the circumstances claimed to create the exceptions.

Commonwealth sought leave to respond. We deny that request because it is not a matter for our court, at least at this time. Our function under the Supreme Court mandate is to decide what we have been directed to decide and to reflect our decision in the modified judgment.

*Id.*

■■■ The clinics contend that by declining to rule on whether to reopen the record, we implicitly authorized the district court to do so. We cannot agree.[20] Because we are bound to follow the mandate of the Supreme Court, we could not authorize reopening the case. Therefore, we hold that, consistent with the Supreme Court's mandate, this new challenge cannot be brought before implementation. It is clear that the Court decided this case and remanded it only for the question of severability and for routine disposition. However, we read the Court's opinion to permit a future challenge to the Pennsylvania Act in another case after the Act goes into effect. The fact-bound nature of the new standard—inquiring if the law is a "substantial obstacle," *Casey* III, —— U.S. at ——, 112 S.Ct. at 2830—suggests that a challenge after enforcement of the Pennsylvania Act might yield a different result on its constitutionality.[21]

## IV.

The Supreme Court's mandate in *Casey* and our mandate on remand require the district court "to implement both the letter and spirit of the mandate, taking into account the [Supreme Court's] opinion and the circumstances it embraces." *Bankers Trust Co.*, 761 F.2d at 949–50. For the foregoing reasons, we will reverse the district court's order continuing the injunction and reopening the trial and remand with directions to enter judgment for the Commonwealth.

---

**20.** Additionally, the remand opinion's willingness to defer judgment reflects the way the point was raised. We merely declined to decide an issue which was not then before us, in part because the clinics claimed that they had not raised the issue. The clinics initially stated they would seek "further factual findings related to ... the new undue burden analysis." Appendix at 153. The Commonwealth responded by requesting our permission to file a surreply brief on this issue, *id.* at 197, whereupon the clinics responded that they

ha[d] not, as the Commonwealth suggests, asked this Court to decide, at this juncture, the propriety of the district court's reopening the record to take additional proof under the new *Casey* undue burden standard. Rather, for purposes of clarity and to avoid a subsequent claim of waiver by the Commonwealth, appellees simply apprised this court of their intention upon remand to make additional claims in the district court. These claims will include a request that the district court reopen the record so as to allow plaintiffs the opportunity to put on additional proof to satisfy the new burden of proof adopted by the Supreme Court.

Appendix at 205. Having prompted our deferral of the issue, the clinics may not now contend this deferral reveals we approved reopening the record. In light of our disposition, we do not address the Commonwealth's contention that the clinics are judicially estopped from seeking to reopen the record because they previously argued the existing record established that the law fails even rational basis review.

**21.** Although we do not believe the Supreme Court's mandate allows a further pre-implementation facial challenge to the Pennsylvania Act, we agree with the Commonwealth and the clinics that the Court has, in this case, set a new standard for facial challenges to pre-viability abortion laws. Under the old rule, a successful facial challenge required a plaintiff to show that "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745, 107 S.Ct. 2095, 2100, 95 L.Ed.2d 697 (1987). *Casey* requires only that a plaintiff show an abortion regulation would be an undue burden "in a large fraction of the cases." *Casey* III, —— U.S. at ——, 112 S.Ct. at 2830. As we have noted, we believe a future "as applied" challenge could be brought, alleging that the law as implemented creates a "substantial obstacle" to a woman's desire to seek an abortion before the fetus attains viability.